NOTICE
Decision filed 08/02/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 190140-U

NO. 5-19-0140

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 17-CF-198 |
| | ) | |
| JEROLD JONES, | ) | Honorable |
| | ) | Kevin S. Parker, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the judgment and sentence of the trial court. The defendant was not denied a fair trial where the trial court's discovery sanction was not an abuse of discretion. The defendant's argument regarding a modified jury instruction was forfeited. The trial court's error in questioning the jury pursuant to Illinois Supreme Court Rule 431(b) did not result in prejudice where the evidence was not closely balanced. The trial court properly considered psychological harm in aggravation during sentencing. The defendant was not denied the effective assistance of counsel.

¶ 2    The defendant, Jerold Jones, was convicted after a jury trial of two counts of indecent solicitation of a child, in violation of section 11-6(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-6(a) (West 2016)), and one count of aggravated criminal sexual abuse, in violation of section 11-1.60(d) of the Code (*id.* § 11-1.60(b)). The trial court determined that the second count was a lesser included offense of the first, and thus the defendant was sentenced on one count of indecent solicitation of a child. The defendant was sentenced to seven years' imprisonment for

1

indecent solicitation of a child, concurrent to a seven-year sentence for aggravated criminal sexual abuse.

¶ 3    The defendant appeals, arguing that (1) the trial court erred when it precluded him from introducing documentary evidence of his affair with Sheana Flood, (2) the trial court erred in giving the State's modified jury instruction, (3) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (4) the trial court erred in considering that the defendant's actions created a threat of psychological harm during sentencing, and (5) the defendant was denied the effective assistance of counsel. For the following reasons, we affirm the judgment of the trial court.

¶ 4                                    I. BACKGROUND

¶ 5    In June 2017, the State charged the defendant with indecent solicitation of a child, alleging that on May 30, 2017, the defendant, while over the age of 17, knowingly solicited a child, C.C., to commit an act of sexual penetration which, if done, would have been a criminal sexual assault in violation of section 11-1.20(a)(4) of the Code (720 ILCS 5/11-1.20(a)(4) (West 2016)), since the defendant held a position of trust or supervision over C.C., in violation of section 11-6 of the Code. In November 2017, the State charged the defendant with indecent solicitation of a child, in that the defendant while over the age of 17 solicited a child under 17 years of age to commit an act of sexual conduct which would have been aggravated criminal sexual abuse in violation of section 11-1.60(d) of the Code, while being more than 5 years older than C.C., in violation of section 11-6 of the Code. In May 2018, the State charged the defendant with aggravated criminal sexual abuse, alleging that on May 30, 2017, the defendant, being at least 5 years older than C.C., committed an act of sexual conduct with C.C., who was at least 13 but under 17 years of age at the time. The State alleged that the defendant touched the breast of C.C. with his hand for the purpose of sexual

2

gratification or arousal, in violation of section 11-1.60(c) of the Code. The defendant elected to proceed to a jury trial.

¶ 6                                    A. Pretrial Motions

¶ 7    The State filed a motion *in limine* pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2016)), on May 16, 2018, seeking to admit evidence that the defendant committed an incident of predatory criminal sexual assault of a child that occurred in the State of Indiana in 2009, for the purposes of showing the defendant's propensity to commit the present offense. The motion was granted. The State filed a second motion *in limine* pursuant to the same statute on July 10, 2018, seeking to introduce evidence that the defendant had a prior conviction for possession of child pornography, which was denied.

¶ 8                                    B. Defendant's Jury Trial

¶ 9    Below, we summarize the relevant portions of the defendant's jury trial, held over three days on October 1, 3, and 4, 2018. Where more detail is needed for purposes of analysis, it will be included in that section.

¶ 10                                   1. Deputy Brandon Murray

¶ 11   Deputy Brandon Murray testified that he was employed with the Effingham County Sheriff's Department. During Deputy Murray's shift on May 30, 2017, he was dispatched by the Altamont Police Department based on a complaint made by John Flood that an attempt was made by the defendant to take his daughter, C.C., to a hotel, the Relax Inn, in the Altamont area. Deputy Murray met with C.C. that day. He saw a one-inch scratch that he thought could have been caused by a hand on the left side of her abdomen. Deputy Murray testified that the defendant was 47 years old and C.C. was 14 years old at the time Deputy Murray met with her.

¶ 12    Deputy Murray testified that based on the complaint, he interviewed the defendant at his residence, located in Effingham County a bit west of the City of Altamont. Deputy Murray testified that when he arrived to speak with the defendant, he found a white work truck that was registered to a contracting service out of Alabama, where the defendant worked, parked to the south of the house. Deputy Murray saw a six-pack of Bud Light bottles in the passenger seat with two bottles missing. Two bottles had lids that were off and two had lids intact. On the front passenger floorboard there was a six-pack of Jack Daniel's Lynchburg Lemonade alcoholic drinks (Jack Daniel's lemonade).

¶ 13    Deputy Murray again interviewed the defendant at the Effingham County Sheriff's Department and that interview was audio recorded. The defendant initially denied that he had ever gone to the Relax Inn in Altamont earlier that evening. When confronted with the evidence that he had rented a room at the Relax Inn earlier that evening, the defendant admitted that he had been at the Relax Inn. The defendant explained that he stayed in hotels quite often because his sister lived with him, she had a dog, his room was under construction, he does not have a bed, and the couch was uncomfortable. When asked about the Jack Daniel's lemonade found in the defendant's work truck, the defendant advised that it was purchased for his sister. Deputy Murray testified that at no point during the interview did the defendant indicate that he was having any sort of romantic relationship with C.C.'s mother, Sheana Flood.

¶ 14                                    2. Lisa Jones

¶ 15    Lisa Jones testified that she is the defendant's sister and lived with the defendant at his house on May 30, 2017. On that date, Lisa worked from 1 p.m. to 7 p.m. She testified that she returned from work at approximately 7:30 p.m. When she got home, she saw the defendant's work truck with the door open but did not see or hear anybody else inside or outside of the house. Lisa

stated that she had assumed that her brother was in the barn, and that he returned to the house at about 8:50 p.m. The two had a brief conversation, then the defendant made his dinner, played with the dog, and went to bed. At around 10 p.m., Lisa heard a knock on the door and it was the police.

¶ 16 Lisa testified she had not had anything to drink that evening and rarely drank at all but would occasionally have one alcoholic beverage. Lisa stated that she had consumed a beer or two, which was her drink of choice, in the six months preceding May 30. Lisa testified that she would drink a Jack Daniel's lemonade if someone offered it to her, but it was not what she preferred, and she had no plans to drink with her brother on May 30. Lisa testified that the defendant stayed in hotels once in a while because he wanted to sleep in a bed while his room was under construction. While Lisa did not count how often the defendant stayed in hotels, she admitted that when interviewed by the police on May 30, 2017, she had said that the defendant only stayed in a local hotel one to two times in a year. Lisa testified that both she and her brother, out of respect for each other's living space, would not bring people back to the house. Lisa would meet her boyfriend elsewhere and the defendant did the same. On May 30, Lisa never saw C.C. or Sheana Flood.

¶ 17                                          3. C.C.

¶ 18 C.C. testified that on May 30, 2017, she was 14 years old. On that date, she went to the defendant's house in Altamont with her mother, Sheana Flood, and her two brothers, ages nine and four. At some point in the day, the defendant commented that his niece was supposed to help with chores around the house but had not. C.C. offered to help, and the defendant offered to pay her for her work. Sheana Flood agreed that C.C. could help later that day and the next morning. It was decided that C.C. would spend the night with the defendant and Lisa Jones. C.C. went home to get supplies for the sleepover and Sheana Flood returned her to the defendant's house, eventually leaving her alone with the defendant. C.C. testified that she and the defendant talked for a while

5

in the barn, and he asked her to get him a beer, which she did. The defendant drank some of the beer and asked C.C. to drink as well. The defendant asked C.C. to change her clothes into something more comfortable, which she did. When C.C. returned in similar clothing to what she had been wearing, the defendant asked her if she had anything different to change into, like something loose, or a bikini. The defendant asked her to play a game, and C.C. asked to use the defendant's cellular telephone (telephone). The defendant allowed her to use his telephone, which she took into the bathroom in the house and called Joel Mars, her boyfriend. C.C. explained that she called Mars because she could not find Sheana Flood's contact information in the telephone's contacts list. C.C. asked Mars if he could pick her up because she was feeling scared to be alone with the defendant, fearing that he would rape or kill her or both. C.C. did not know exactly where she was but tried to describe her location to Mars. After hanging up with Mars, C.C. returned to the barn.

¶ 19    C.C. testified that once she was back in the barn, she sat on a chair. The defendant asked C.C. in a more commanding tone to play a game. When she told the defendant no, C.C. sensed that the defendant was getting mad. He pushed her off of the chair that she was sitting on. C.C. testified that she was scared, so she just sat there. The defendant began to massage her back over her clothing, and then under her shirt. C.C. testified that the defendant moved his hand around to her front and put his hands between her underwear and pants. He then moved up and touched the side of C.C.'s breast on the outside of her clothing. C.C. stood up and asked again to use the defendant's telephone, and without waiting for an answer, she grabbed the telephone and went back into the house. Once inside, C.C. called Mars again. C.C. was upset, and when she was inside the bathroom, she heard a dog. C.C. thought she heard someone coming and opened the door to find the defendant. He told C.C. that there was a change of plans and that they would be going to a hotel.

6

C.C. testified that the defendant was forceful with her and shoved her toward the white truck. C.C. was scared and got into the truck.

¶ 20    The defendant drove to a local liquor store. On the way there, the defendant asked if C.C. had any plans that weekend. When she responded that she had "plans to go to her dad's," she believed that he got angry as the tone of his voice changed, and he hit the dashboard. The defendant asked C.C. her age and she told the defendant that she was 14. She testified that the defendant responded, "Oh, darn" and told C.C. that she looked 18.

¶ 21    Once at the liquor store, the defendant went inside and left his telephone behind. While the defendant was inside, Mars called his telephone and C.C. answered, telling him that she was heading to the hotel by the interstate. The defendant came back to the truck and had a six-pack of beer and some Jack Daniel's lemonade. The defendant did not tell C.C. that the Jack Daniel's lemonade was for her, and she did not drink it. The defendant drove toward the hotel and put his hand on C.C.'s thigh on the way there. The defendant threatened C.C., stating that if she told anyone anything that had happened, he would kill Mars.

¶ 22    Once at the hotel, the defendant said he was going to get them a room, got out of the truck, and went inside. At that point C.C. used the defendant's telephone to call Mars. Mars's dad's girlfriend, Jennifer, picked up the call and told C.C. that she was almost there and to get out of the truck. Once Jennifer and Mars arrived, C.C. got into their truck, and they drove C.C. to her house.

¶ 23                                    4. Nimesh Patel

¶ 24    Nimesh Patel testified that he had owned the Relax Inn in Altamont for 12 years. Patel provided the hotel's surveillance video from May 30, 2017, to the Effingham sheriff's department. The video provided showed the defendant at the hotel on that day. Patel also identified his hotel check-in slip where patrons record their information for the hotel, which evidenced the defendant's

7

name checking in on May 30, 2017. Patel testified that the defendant paid for a room with his credit card and was assigned room 221, but that no one ever went to that room. Patel saw that the defendant had left the hotel and, as Patel lived on the side of the hotel, noticed that the defendant never returned. The next morning Patel checked the room, and it was clean and undisturbed. Patel testified that he had never seen the defendant before in his 12 years of running the hotel.

¶ 25                                5. Joel Mars

¶ 26     Joel Mars testified that on May 30, 2017, C.C. was his girlfriend. On that date, C.C. called Mars from an unknown telephone number and was crying and breathing heavily. C.C. told Mars that she needed help. C.C. asked Mars to pick her up at "a green house on 40 on the outside of Altamont." At about 6 p.m., Mars was able to find a green, two-story house with a garage and a barn about a half mile outside of Altamont. Mars was familiar with the house because he passed by it almost every day on his way to work at the McDonald's near the Relax Inn. Mars knocked on the door and heard a dog bark, but no one answered the door. He searched for a vehicle but could not find one. He then called C.C., who said that she was at the liquor store on the way to the Relax Inn. Mars told her that he and his dad's girlfriend, Jennifer, would meet C.C. there. When they arrived at the Relax Inn, Mars saw C.C. standing outside of the hotel next to a white Chevy work vehicle and she was crying. C.C. got into the truck with Mars and Jennifer, and they left. Mars did not see the defendant. About 30 minutes later, Mars sent a series of text messages to the defendant's telephone number asking who the telephone belonged to and stating that the defendant was lucky that he had not seen him.

¶ 27                               6. Nathan Shouse

¶ 28     Nathan Shouse testified that when he was 14 years old in March 2009, he was neighbors with the defendant. They lived in Owen County, Indiana. Shouse would go over to the defendant's

8

house with his little sister, P.S., who was 12 years old at the time. Shouse and P.S. would do yard work or housework for money and cigarettes. Shouse testified that for a period of about two months, he and P.S. were at the defendant's house a couple of times per week.

¶ 29    On March 3, 2009, Shouse and P.S. went over to the defendant's house before he got home from work to get some cigarettes that he kept there for them. When the defendant returned home from work, he had whiskey with him. Shouse testified that he sat at the kitchen table drinking the whiskey out of a coffee mug, which was the first time that he had tried alcohol. He did not remember falling asleep but remembered waking up on the couch to P.S. screaming and yelling. P.S. sounded panicked and in distress. Shouse determined that the screaming was coming from the bedroom and tried to get into the room, but the door was locked.

¶ 30    At that point, Shouse went out the front door and came through the back window to the attic. Shouse knew he could access the bedroom from that window, as he and P.S. had gone that way many times when the defendant was not home to get their cigarettes. The window, he said, could be pried open with a butter knife. The staircase from the attic led to the master bedroom where the screams were coming from. Shouse testified that he got downstairs and went into the bedroom and saw P.S. bent over the bed with her pants off and she was yelling and trying to get away from the defendant, who was on top of her from behind. Shouse ran over and tried to push the defendant as hard as he could, but the defendant swung Shouse across the bed and started hitting him. After hitting Shouse about five or six times, the defendant seemed to "snap out of it," turned around, and walked through the bedroom door. Shouse got P.S. and ran outside of the house. Both of the children ran home and to their respective rooms. Shouse testified that he did not want to tell his parents what had happened because he had been smoking and drinking, but after about 10 minutes, he realized that there was no way to conceal his swollen face, nose, and mouth.

9

7. Motions *in Limine* During Trial

¶ 32    After Shouse testified, the State rested its case, and the trial court sent the jury home for the day. Prior to reconvening on October 4, the State moved to reopen its case to call three additional witnesses: Sheana Flood, Robyn Carr, and Darin Deters. The trial court allowed the State to reopen its case. The State made an oral motion *in limine* to exclude evidence of a conversation purportedly between the defendant and Sheana Flood contained in the defendant's Facebook Messenger account (Messenger). The State indicated that, during the trial on the previous day, defense counsel had leaned over in court and shown the State a telephone screen with a conversation from Messenger on the defendant's telephone. The State was able to see that the telephone screen depicted a conversation. As the parties walked into court that morning, defense counsel had indicated that he would impeach Sheana Flood with the Messenger conversation between her and the defendant. According to defense counsel, the conversation was sexual and romantic in nature and indicative of an affair between the defendant and Sheana Flood. The State argued that they had not been provided, pursuant to their discovery requests, with the messages that defense counsel intended to use to impeach Flood.

¶ 33    The trial court inquired of defense counsel what his intention was regarding the utilization of the messages contained in the defendant's Messenger account. Defense counsel indicated that it was his intent to use the messages to impeach Sheana Flood if she testified and denied having an affair with the defendant. Defense counsel described the messages to the trial court, indicating that the conversation was sexual and romantic in nature, and involved discussions about Sheana Flood's husband. The State replied that defense counsel had shown the State one message the day prior, but that the State still had not seen the multiple messages that defense counsel described. The trial court stated that "[a]t this point, though, there does have to be some adherence to the rules

of discovery." The court went on to rule that if the State were to reopen its case and call Sheana Flood, the trial court would not limit the defendant's right to cross-examine her with whatever materials it deemed necessary and competent in terms of evidence. The trial court ruled, however, that if the State did not call Sheana Flood, the defendant would not be permitted to use the information from his Messenger account in his case-in-chief.

¶ 34 The State then requested an opportunity to inspect the evidence. The State indicated that it was moving to reopen its case and would call Sheana Flood. The trial court then inquired how defense counsel would provide the evidence to the State and introduce the evidence in the trial. Defense counsel indicated that he had the program open on his cellular telephone and was willing to share the defendant's Facebook credentials with the State. Defense counsel indicated that he could print a copy of the messages to introduce them as an exhibit for the purposes of trial. The trial court inquired of defense counsel how he would lay a foundation. At that point, prior to any answer from defense counsel, the trial court indicated that it had reconsidered its ruling and "[t]he defendant's request is denied." The trial court also indicated that it would give the defendant a "wide berth" in cross-examination in the event that Flood testified.

¶ 35 The State did not call Flood and rested its case after calling one additional witness. Defense counsel made a motion for a directed verdict, which was denied. Defense counsel then called his first witness.

¶ 36                                   8. Detective Darin Deters

¶ 37 Detective Darin Deters testified that he was the investigations supervisor at the Effingham County Sheriff's Department. After interviewing Lisa Jones on May 31, 2017, he traveled with Jones to the defendant's house and Lisa turned over a white Samsung cellular telephone purported to have belonged to the defendant. The telephone was collected as evidence. The telephone was

11

removed from evidence and analyzed on August 7, 2018, after a search warrant was issued for the device. Detective Deters provided the telephone to Lieutenant Jason McFarland with the Effingham County Sheriff's Department. Lieutenant McFarland had a device that he used to extract information from the telephone and download the information onto a disk. Detective Deters explained that the download from the telephone included a call log, with a time-stamped record of every telephone transaction presented in chronological order. Detective Deters testified that there were telephone calls in the telephone's call log on May 30, 2017, showing calls between the defendant's telephone and the telephone of Joel Mars. There were approximately 15 or 16 calls between the two numbers between 11:32 and 12:28 universal time code. There were also messages between the two numbers.

¶ 38　Defense counsel introduced three exhibits of photographs that came from the telephone download, sent from Flood to the defendant. Detective Deters testified that defendant's exhibit 1, a photograph of the defendant and Sheana Flood, was sent to the defendant's telephone on May 30, 2017. Defendant's exhibit 2, a photograph of Sheana Flood, was sent on May 22, 2017, at 1:53 a.m., and defendant's exhibit 3, a photograph of a hand holding a Mike's Hard Lemonade reaching from behind the camera with C.C. in the frame holding a soda, was sent on April 12, 2016. The photographic exhibits were admitted into evidence.

¶ 39　　　　　　　　　　　　　　9. Jerold Jones

¶ 40　The defendant, Jerold Jones, testified that he lived in Altamont and was employed as a traveling heating, ventilation, and air conditioning (HVAC) mechanic. The defendant worked on the HVAC systems for stores like Walmart and Target. The defendant testified that he would typically travel for five or six weeks at a time and then get a week off every month or so. The defendant lived with his sister, Lisa Jones, in May 2017. Both were single at the time. The

12

defendant described his property as under two acres, with a house, garage, barn, and pump house. The house needed a lot of repairs and was under construction in May 2017.

¶ 41     The defendant testified that he knew C.C. through her mother, Sheana Flood. He had been seeing Flood once in a while despite her being married at the time. On May 30, 2017, Flood came to the defendant's house with her three children to visit for the day. The family arrived at the defendant's house at about 1:30 p.m. Lisa was at work at that time and was expected home a little after 7 p.m. They were all in the barn, and he and Flood talked while the children played with toys. The defendant was building shelving for tools and storage. The defendant testified that he was drinking Miller Lite or Bud Light but could not remember which brand of beer. At some point in the day, Flood left to go home and get some stuff. The defendant said that they had explained to him that C.C. was on her period, so C.C., Flood, and her youngest son left together while her other son stayed behind. The defendant believed that this occurred at around 4:30 p.m. While they were gone, Flood's son played on a scooter while the defendant watched. After about 20 to 30 minutes, Flood and C.C. returned without Flood's youngest son.

¶ 42     The defendant testified that he had talked with Flood and C.C. about doing some work at the house for money, as Flood was trying to save some money to leave home. The defendant was going to have Flood and C.C. help to move some furniture and other items upstairs so that the carpenters that he had coming could access the area where they needed to work. The defendant testified that the discussion was that Flood and C.C. were going to start work the next day when they would come over together. The defendant testified that there was never any discussion about C.C. spending the night at the defendant's house. C.C. would not have had a place to sleep as the defendant was sleeping on the couch and his sister was sleeping in the only suitable bedroom.

¶ 43    Flood and her son left again at some point to take him home to his dad. C.C. was left at the defendant's house so that Flood would have an excuse to return. The defendant testified that when he realized that Flood would not get back until after his sister returned from work, he decided to get a hotel room. The defendant went to the liquor store in Altamont, which was near his house and also near the Relax Inn. The defendant bought six-packs of Bud Light bottles and Jack Daniel's lemonade. The defendant had "drank quite a few beforehand" and bought the beer for himself. The defendant testified that he bought the Jack Daniel's lemonade for "Flood or whoever wanted them." The defendant believed that Flood liked Jack Daniel's lemonade because she had told him she liked it, he had seen it in her pictures, and had seen her drink it previously.

¶ 44    Defense counsel introduced defendant's exhibits 1, 2, and 3. The defendant testified that exhibit 1 was a photograph of the defendant and Flood together, exhibit 2 was Flood by herself wearing a dress, and exhibit 3 was Flood's hand holding a Mike's Hard Lemonade. The defendant testified that Flood had sent the defendant the photographs to his telephone. The defendant testified that he and Flood were engaged in a sexual relationship and that it was a secret from Flood's husband. The defendant testified that Flood was trying to leave her husband, and that she and the defendant had an emotional bond along with a sexual relationship, speaking to each other frequently. The defendant went on to testify that after he and C.C. left the liquor store, they went to the Relax Inn. The defendant testified that it was not his intention to bring C.C. into the hotel room, although she would have been with him until Flood returned.

¶ 45    The defendant testified that in 2009, he was living in Indiana near Spencer in Owen County. The defendant lived on his employer's farm in a two-room house with a small bathroom. The defendant testified that he did not leave cigarettes for Shouse and P.S., and they did not have permission to come and go from his home. The defendant became aware that the children were

14

coming into his house when he was not home because he would see footprints on the countertop where he kept his cigarettes and alcohol, and beer was missing from the refrigerator. On one evening, he was sitting on the couch watching television and heard giggling. The defendant found the children hiding behind the couch. The attic window was easily accessed because the house was built into a hill. Therefore, the attic was at ground level at the back of the house. The defendant testified that he eventually screwed shut the window and the trap door leading to the bedroom.

¶ 46    On the day that Shouse testified about, the defendant saw Shouse for the first time at around 3 to 3:30 p.m., when the defendant returned home from work. Shouse and P.S. came running across the yard and told the defendant that they were going to try to stay the evening or night with the defendant as their parents were going to be out for the night. The defendant testified that he said no and went to sleep around 7 to 7:30 p.m. The defendant woke up to the children in his bedroom, with Shouse burning the defendant's arm with a butane torch lighter. The defendant said, at that point, "I commenced to beating." The defendant denied having P.S. with her pants down and denied that any of the events described by Shouse had happened.

¶ 47    Returning to the events involving C.C., the defendant testified that a deputy of the Effingham County Sheriff's Department came to his house and took him to the station. The defendant admitted that when he was initially asked about what had occurred on that day, he did not tell the officer that he had bought alcohol or had obtained a hotel room to spend time with Flood. The defendant testified that he had not offered that information because he did not want to get Flood involved. At that point, the defendant explained that he had not known what he was being accused of and had he known, he would have opened up more.

¶ 48    On cross-examination, the defendant testified that he was informed during his police interview that he had been accused of touching C.C. The defendant testified that he was not aware

15

of the gravity of the accusation as he was not aware of what form of touching the officer was talking about. The State asked the defendant if, at one point in the interview, the defendant had stated "[w]hat do you mean her boobs," and then admitted that he was aware of the nature of the accusations during the interview. The defendant testified that he was interviewed by Deputy Brandon Murray. Deputy Murray asked the defendant what was going on with C.C., and the defendant told Deputy Murray that he had caught C.C. drinking beer at the house. The defendant told Deputy Murray that he and C.C. went to the liquor store in the defendant's Chevy truck. The defendant testified that when Deputy Murray asked if they went anywhere else, the defendant said no and denied ever going to the Relax Inn. When Deputy Murray confronted the defendant with the fact that there was a video of him at the Relax Inn, the defendant again denied being there.

¶ 49    The defendant testified that later in the interview, he admitted to sometimes getting a room and later admitted that he had gone to the Relax Inn that night to get a room. The defendant testified that he did not tell Deputy Murray that he went to get a room for himself and Flood in an attempt to protect her marriage. The defendant denied doing "this thing with [C.C.]." The defendant testified that he had been romantically involved with Flood since 2016. The defendant testified that when Flood left them alone in the barn, C.C. had spent most of her time in the barn on the defendant's telephone. Because C.C. was complaining that she was hot, the defendant stated that he had asked her to change clothes so that she could do some work. The defendant testified that he told Deputy Murray that he believed C.C. was 17 or 18 years old because C.C. had been driving her mother's car that day. The defendant denied ever touching C.C. and explained it would be impossible to do so in his work truck. The defendant testified that he never punched the console of the truck and never threatened to kill C.C.'s boyfriend.

16

¶ 50    After the defendant's testimony, the defense rested their case. Defense counsel again raised the issue of the Messenger evidence that he wished to use to cross-examine Flood with, should the State call her as a witness in rebuttal. The trial court accepted defendant's exhibit 5 as an offer of proof of what the defendant would use in the event that Flood testified in rebuttal and denied a sexual relationship with the defendant. The State pointed out to the trial court that the defendant's exhibit 5 appeared to be a snippet of a conversation, with no dates or times. The State did not present any additional witnesses.

¶ 51    The trial court held a jury instructions conference. During the conference, there was no objection by either party to the proposed jury instructions, other than the modified version of Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter modified IPI Criminal No. 3.14), regarding propensity evidence. Both parties proposed a modified version of IPI Criminal No. 3.14 be read to the jury. Defense counsel tendered a version which stated:

> "Evidence has been received that the defendant has been involved in conduct other than that charged in the indictment.
>
> It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence."

The trial court denied the defendant's version of the jury instruction, finding that it did not go far enough in clarifying to the jury how to use the other-crimes evidence, as it omitted the language that the evidence could be considered on the issue of the defendant's propensity to commit the crime charged.

¶ 52    The trial court suggested language and the parties agreed to the trial court's suggestion, with the State to prepare a copy that encompassed the agreement. The State provided People's 31, which read:

> "Evidence has been received that the defendant has been involved in an offense other than that charged in the indictment.
>
> This evidence has been received on the issue of the defendant's propensity, and may be considered by you only for those limited purposes.
>
> It is for you to determine whether the defendant was involved in the conduct and, if so, what weight should be given to this evidence on the issue of the defendant's intent."

The State's submission was intended to encompass the trial court's proposed language from the jury instructions conference; however, the word "intent" in paragraph 3 was substituted for the word "propensity."

¶ 53    The trial court gave defense counsel an opportunity to comment on the newly proffered instruction prepared by the State, to which defense counsel replied, "I don't have any further argument. Just show it over my objection." The written jury instruction was given to the jury with the word "intent" included in paragraph 3; however, when reading the instruction aloud to the jurors after the close of evidence, the trial court substituted the word "propensity" for "intent." Therefore, the oral reading of the jury instructions did not include the error.

¶ 54    The State and defense counsel presented closing arguments and the case was submitted to the jury. The jury found the defendant guilty of all three counts.

¶ 55    The trial court conducted a sentencing hearing on December 6, 2018, and clarified the sentence on January 30, 2019. The trial court found that count II, indecent solicitation to commit criminal sexual abuse, was a lesser included offense of indecent solicitation to commit sexual

18

assault, and thus sentenced the defendant on counts I and II. The trial court sentenced the defendant to seven years' incarceration, on each count, in the Illinois Department of Corrections, with the sentences to run concurrently.

¶ 56                                C. Posttrial Motions

¶ 57    The defendant filed a motion for acquittal, or in the alternative, motion for a new trial on October 30, 2018. The defendant argued that the trial court erred in (1) granting the State's motion *in limine* to allow other-crimes evidence, (2) limiting the defendant's evidence regarding the defendant's relationship with the victim's mother, (3) accepting the State's proposed instruction 31, modified IPI Criminal No. 3.14, and (4) that the State did not meet their burden of proof. The trial court held a hearing on December 6, 2018, prior to sentencing, and denied the defendant's posttrial motion.

¶ 58    The defendant filed a motion to reconsider the defendant's sentence on January 4, 2019. The defendant argued that the sentence was excessive, in light of: (1) the State's evidence in aggravation; (2) a sentence of fewer years would have achieved the goals established in the Illinois Constitution; (3) the trial court failed to give adequate consideration to the defendant's potential for rehabilitation; (4) the sentence failed to comply with the Illinois Constitution's requirement that penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship; (5) the sentence was not in keeping with the defendant's past history of criminality, mental history, family situation, economic status, education, and occupation; (6) the sentence was not in keeping with the alternatives available to the trial court to assist the defendant in his rehabilitation; and (7) the trial court erred in considering the supplement to the presentence investigation report, which was filed on December 3, 2018, over the defendant's objection. At a hearing on March 13, 2019, defense counsel rested on the motion.

19

The trial court denied the motion on March 28, 2019, by docket entry. A timely notice of appeal was filed on April 4, 2019. This appeal followed.

¶ 59                                II. ANALYSIS

¶ 60     The defendant raises five issues on appeal. The defendant argues that the trial court erred in that: (1) the trial court violated the defendant's right to present a defense when it precluded him from introducing documentary evidence of his affair with Flood, (2) the State's modified IPI Criminal No. 3.14 was given in error, (3) the trial court did not properly admonish the potential jurors under Rule 431(b), (4) the trial court erred in sentencing by considering that the defendant's actions caused or threatened serious psychological harm in aggravation, and (5) defense counsel provided ineffective assistance of counsel by failing to request that certain portions of the defendant's recorded interrogation be redacted, as those portions contained inadmissible, irrelevant, and prejudicial statements.

¶ 61                            A. Messenger Evidence

¶ 62     First, we will address the defendant's argument that the trial court erred by precluding the defendant from introducing evidence in the form of messages contained in the defendant's Messenger account. Evidentiary rulings are reviewed for an abuse of discretion. *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007). The defendant argues that they were messages between himself and Flood that would have corroborated the defendant's testimony that he rented a room for the night to spend time with Flood and not C.C. Further, the defendant argues that the exclusion of such evidence violated his constitutional rights by denying him the right to present a complete defense. The defendant also alleges, in his reply brief, that the excluded evidence included photographs of Flood and a photograph of a sex toy that Flood had sent to the defendant. The State argues that the trial court's exclusion of the evidence was an appropriate sanction for a discovery violation, that

20

the defendant was not precluded from presenting the evidence as intended, and that the defendant's due process rights were not violated.

¶ 63    During the hearing on the motion to exclude the Messenger evidence, the State said that defense counsel had also presented a stack of pictures along with the Messenger evidence, and the State moved to exclude one of the photographs based on a lack of relevance. Defense counsel proffered to the court that "[i]t is a picture of a sex toy that Miss Flood sent to my client. And it's relevant"; however, the photograph was not proffered at trial. The trial court denied the State's motion *in limine* as to the "exhibit" and held that it may be introduced with proper foundation and subject to cross-examination. It does not appear that defense counsel ever attempted to introduce the photograph into evidence.

¶ 64    It is unclear what photographs of Flood are being discussed in the reply brief; however, the defendant did introduce three photographic images into evidence from the defendant's telephone, including two photographs of Flood and a photograph of C.C. The defendant testified that Flood sent him the pictures. As there is nothing in the record on appeal showing any additional excluded evidence, we will proceed with addressing only the Messenger evidence contained in the defendant's exhibit 5.

¶ 65    The defendant argues that the trial court's ruling was that the Messenger evidence was inadmissible because it lacked relevance. The State argues that the trial court's evidentiary ruling was an appropriate sanction based on a discovery violation. The confusion is understandable, as there is some basis in the record on appeal for both interpretations.

¶ 66    On the third day of trial, prior to the State reopening its case, the State made an oral motion *in limine* seeking to exclude evidence of a Messenger thread that defense counsel had shown the State on a telephone during day two of the trial. The Messenger evidence included what was

21

purported to be messaging between two accounts belonging to the defendant and Flood. The defendant, later in the trial and after resting his case, presented the trial court with defense exhibit 5, which was a three-page printout of a text style conversation, referred to herein as the "Messenger evidence." There are no dates or times included in the exhibit. The conversation depicted is sexually explicit in nature. There are no names or identifying account information included in the exhibit.

¶ 67    During the hearing on the motion *in limine*, the trial court heard the State's arguments that the Messenger evidence was not provided in response to the State's discovery requests, and that disclosure at such a late juncture during trial would result in the State not having the ability to adequately investigate the records and questioned the records' authenticity. As such, the State argued a discovery violation. Defense counsel argued that, after the State advised that it intended to reopen its case and call Flood, defense counsel should be allowed to cross-examine her with "her own words" if she would "presumably take the stand and deny the affair." Defense counsel concluded that "it would be completely unfair to deny us the opportunity to cross-examine her." The trial court indicated that if the State was going to seek to reopen its case and call Flood, "then the Court is not going to limit the Defendant's right to cross-examine with whatever materials it deems necessary and is competent in terms of evidence. If the State does not recall [Flood] in making it's [*sic*] motion to reopen, then the Defendant will not be permitted to use that information." After the trial court inquired about defense counsel's intent to use the Messenger evidence in the cross-examination of Flood, the format that the evidence would be presented, and possible authentication issues, the trial court stated: "The Court is reconsidering. The Defendant's request is denied. I will give the Defendant a wide berth in cross-examination in the event that

[Flood] testifies. There will be very few objections—well, I'll wait to rule on them as they are presented."

¶ 68    During the hearing, neither party raised or argued the relevance of the Messenger evidence and the trial court did not comment on its relevance. The State chose not to call Flood as a witness, and rested its case, thus rendering the use of the Messenger evidence moot as it related to the cross-examination of Flood.

¶ 69    Defense counsel did not raise the issue of the Messenger evidence again until after the presentation of his case-in-chief. The defendant rested his case, and defense counsel re-raised the issue of the Messenger evidence in relation to its admissibility as cross-examination material should the State call Flood in rebuttal. Defense counsel argued that, at the earlier hearing, the trial court ruled that it "would not allow me to cross-examine [Flood] with that should she testify." At that point, defense counsel presented the trial court with defendant's exhibit 5, a printout of the Messenger evidence, which the trial court accepted as a proffer, along with defense counsel's statements that he could prove the conversation with the defendant in surrebuttal if Flood denied the conversation in rebuttal. The trial court commented that it "made a ruling with respect to calling [Flood] as a witness and stands by that ruling." Flood was not called in rebuttal by the State, again, rendering the use of the Messenger evidence for cross-examination purposes moot.

¶ 70    During the hearing on the defendant's motion for a new trial, the defendant rested on his written motion, which stated that the trial court erred in limiting the Messenger evidence. The defendant's written motion did not state the reason that the trial court limited the evidence, and thus, the defendant made no argument as to why the ruling was in error. The State argued that the evidence was excluded as a discovery sanction as well as highlighted its inability to be authenticated as proffered. Defense counsel responded to the State's argument, discussing the

23

reasons for the late disclosure of Messenger evidence and outlined his ability to authenticate the evidence. Again, neither party argued that the trial court excluded the evidence based on lack of relevance.

¶ 71 The trial court then admitted to having some difficulty remembering for what purpose the defendant wanted to introduce the Messenger evidence. The trial court stated: "I suppose I don't recall exactly what my ruling was at the time as far as discovery or a timely issue. It was certainly mid-late." The trial court then explained that its ruling was "based more upon the fact the Court did not deem the evidence, even if admitted, to bear on any relevance as it relates to the allegations against the Defendant and this minor child that was involved."

¶ 72 Despite the trial court's comments during the hearing on the motion for acquittal or new trial, we agree with the State that the trial court's initial ruling was a discovery sanction. We base this determination on the arguments of the parties and the comments of the trial court at the time of the hearing. The trial court ruled that the defendant's use of the Messenger evidence would be limited to cross-examination of Flood, reconsidered, then ruled that trial counsel would be given a "wide berth" in cross-examining Flood, but could not use the Messenger evidence in his case-in-chief.

¶ 73 The purpose of the discovery rules is to prevent surprise or unfair advantage and to aid in the search for the truth. *People v. Tally*, 2014 IL App (5th) 120349, ¶ 27. The purpose of sanctions is to further the purpose of discovery rules, not to punish the offending party. *Id.* A trial court may impose sanctions for discovery violations, which can include exclusion of evidence not provided to the opposing party. Ill. S. Ct. R. 415(g)(i) (eff. Oct. 1, 1971). A trial court's decision to impose sanctions is reviewed under an abuse of discretion standard. *People v. Ramsey*, 239 Ill. 2d 342, 429 (2010).

24

¶ 74    Defense counsel points us to our decision in *Tally*, 2014 IL App (5th) 120349, where we held that prohibiting a criminal defendant from presenting testimony or evidence as a discovery sanction is disfavored, because it does not further the goal of truth-seeking and will be closely scrutinized on appeal. *Id.* ¶ 28. While we maintain the principles outlined in *Tally*, we do not find that the present case is factually similar.

¶ 75    In *Tally*, the trial court sanctioned the defendant by barring his ability to present an affirmative defense of self-defense. *Id.* ¶ 7. Here, evidence of a brief conversation of a sexual nature, depending on one's interpretation of the ruling, was either excluded in its entirety or limited to its use in cross-examination. Under either interpretation, we consider such a sanction a far cry from denying a defendant the opportunity to present an affirmative defense.

¶ 76    Further, we find that the defendant never sought to use the evidence for anything other than impeachment during the trial. The arguments of both parties at both hearings concerning the Messenger evidence centered on the cross-examination of Flood. At no point during his case-in-chief did defense counsel revisit the Messenger evidence or indicate to the trial court that he wished to revisit the trial court's ruling. We also note that nothing in the trial court's ruling would have prohibited the defendant from calling Flood in his case-in-chief and inquiring about the existence of a sexual or romantic relationship with the defendant. Further, defense counsel  addressed the Messenger evidence again after the close of his case as material he wished to use for impeachment should the State call Flood as a rebuttal witness. The defendant never argued during the hearing on his motion for acquittal or for a new trial that he intended to use, and was prohibited from using, the Messenger evidence during his case-in-chief.

¶ 77    As Flood was never called as a witness, the trial court's ruling had no effect whatsoever on the presentation of the defendant's case, and the defendant was not denied a fair trial. Additionally,

as the defendant only sought to use the Facebook evidence for impeachment purposes, he is estopped from asserting on appeal that he intended to and was denied the use of the Messenger evidence substantively in his case-in-chief, as that is a position that is inconsistent with his position at trial. See *In re Stephen K.*, 373 Ill. App. 3d 7, 25 (2007). Therefore, we do not find that the trial court's ruling regarding the Messenger evidence was an abuse of discretion under the circumstances of this case.

¶ 78                                B. Jury Instructions

¶ 79    The defendant next argues that the trial court committed reversible error when it gave the State's modified IPI Criminal No. 3.14. The defendant challenges the wording of the second and third paragraphs of the modified IPI Criminal No. 3.14, because paragraph 2 instructed the jury to consider the other-crimes evidence for propensity, but paragraph 3 instructed the jury that the other-crimes evidence could be considered for intent. Further, the defendant argues that the instruction was flawed because paragraph 1 of the modified IPI Criminal No. 3.14 included the word "offense" to describe the other-crimes evidence, while paragraph 3 used the word "conduct." Whether jury instructions accurately conveyed the law is an issue subject to *de novo* review. *People v. Smith*, 233 Ill. 2d 1, 15 (2009).

¶ 80    Under the common law, other-crimes evidence may be admitted for limited purposes, such as establishing a defendant's motive, identity, presence, *modus operandi*, knowledge, intent, common design, or absence of mistake, but not his or her propensity, provided that the probative value of the evidence outweighs its prejudicial effect. *People v. Perez*, 2012 IL App (2d) 100865, ¶ 45; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Other-crimes evidence is admissible as proof of any material fact at issue other than propensity, as long as its potential for prejudice does not substantially outweigh its probative value. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v.*

*Donoho*, 204 Ill. 2d 159, 170 (2003). Usually, the great fear of other-crimes evidence is that the jury may consider other-crimes evidence for a propensity inference. *People v. Potts*, 2021 IL App (1st) 161219, ¶ 187. Thus, the pattern instruction provides IPI Criminal No. 3.14, which is used to prevent the jury from considering evidence for the purposes of propensity by listing the exclusive, non-propensity purposes for which the jury may consider the other-crimes evidence. *Id.* ¶ 190.

¶ 81    In contrast, section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2016)) permits evidence of a defendant's prior sexual activity with a child victim to be admitted for any purpose, including the defendant's propensity to commit sex offenses. *Donoho*, 204 Ill. 2d at 170. Like the common law, however, section 115-7.3 permits other-crimes evidence only if (1) it is relevant and (2) its probative value is not outweighed by its prejudicial effect. *Id.* at 177-78.

¶ 82    Prior to the trial in this case, the State filed a motion *in limine* seeking an evidentiary ruling from the trial court on the admissibility of a single instance of other-crimes evidence pursuant to section 115-7.3. After conducting the required statutory balancing test, the trial court granted the State's motion, permitting it to introduce evidence of the defendant's previous act of predatory criminal sexual assault of a child to show the defendant's propensity to commit similar acts in the instant case. The State introduced the other-crimes evidence through the testimony of Shouse. The defendant does not challenge the trial court's ruling on that motion.

¶ 83    During the jury instructions conference, both the defendant and the State tendered a modified IPI Criminal No. 3.14 jury instruction regarding the propensity evidence the jury heard from Shouse. Defense counsel tendered defendant's instruction No. 1, which was refused as it left out any mention of propensity. Defense counsel argued that he preferred his instruction because it focused on the jury's role in determining whether the conduct happened at all and, if so, what

weight should be given to the evidence. The trial court refused the instruction, finding that it did not properly guide the jury as to what they could use the other-crimes evidence for if they found that the conduct occurred. The trial court suggested its preferred language for the modified instruction, and the State acquiesced to the trial court's recommendation. The proposed instruction included the word "propensity" in both paragraphs 2 and 3 of the instruction. The trial court commented that it was a limiting instruction that allowed the other-crimes evidence to be considered by the jury for propensity, stating: "And that's exactly what the statute was designed for, was to show that it goes to propensity. And that's all it goes for. It can't go to anything else if they find it happened to their satisfaction."

¶ 84　The State drafted a modified instruction consistent with the trial court's recommended language. The State tendered State's 31, the written copy of the jury instruction containing modified IPI Criminal No. 3.14, and provided it to the trial court and defense counsel for review. The tendered State's 31 stated:

> "Evidence has been received that the defendant has been involved in an offense other than that charged in the indictment.
>
> This evidence has been received on the issues of the defendant's *propensity*, and may be considered by you only for those limited purposes.
>
> It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issue of the defendant's *intent*."
>
> (Emphases added.)

¶ 85　While the agreed upon language discussed in the jury instruction conference included the word "propensity" in paragraph 3 of the instruction, the word "intent" was substituted. It is clear that the State agreed with the wording that the trial court had suggested in the jury instructions

28

conference and offered to provide a written copy of the jury instruction that conformed with that wording. The State argues that the inclusion of "intent" in paragraph 3 of the written instruction was an obvious and inadvertent clerical error. We agree. Neither the trial court nor the parties commented on or objected to the typographical error in the written jury instruction at the time that it was tendered. Defense counsel was invited by the trial court to comment on the proffered pattern instruction No. 31, which included the clerical error, and stated, "I don't have any further argument. Just show it over my objection." Despite the error in the written instruction, the trial court read the instruction at the conclusion of trial, stating in each paragraph that the jury was to consider the evidence on the issue of the defendant's propensity. The jury did not ask any questions during their deliberation regarding the instruction.

¶ 86    In the defendant's posttrial motion, he raised the issue of the jury instruction with only the following sentence: "The Court erred in giving the State's proposed instruction 31, modified IPI Criminal 3.14 as modified over the Defendant's objection and refusing the Defendant's proposed 3.14 instruction as modified." During the hearing on the defendant's posttrial motion, defense counsel stated: "Judge I think the motion—the written motion adequately addresses the claims of error that the Defendant wishes to assert at this time and I'd rest on the written motion." The State argued that the modified jury instruction was modeled off of a similar instruction given in another case that had passed appellate review. There was no mention in the State's argument of the inclusion of the word "intent." Defense counsel did not comment further on the jury instruction during the hearing on the defendant's posttrial motion.

¶ 87    Generally, a defendant forfeits review of any jury instruction error if he does not object to the instruction or offer an alternative instruction and does not raise the instruction issue in a posttrial motion. *People v. Herron*, 215 Ill. 2d 167, 175 (2005). An issue raised on appeal does not

29

need to be identical to the objection raised at trial (see *People v. Mohr*, 228 Ill. 2d 53, 65 (2008)); however, the phrasing has to be "close enough" to preserve the issue on appeal (*People v. O'Neal*, 104 Ill. 2d 399, 408 (1984)). The argument being raised on appeal must be at least reasonably discernable in the way it was presented to the lower court. A specific objection to a jury instruction forfeits all other unspecified grounds. *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005).

¶ 88     Here, the defendant argues that he preserved his arguments on appeal. We disagree. While the defendant objected to the propensity instruction on the basis of its inclusion of the word "propensity," he did not at any time in the lower court raise the issue of the word "intent" being included in the instruction. In fact, there is nothing in the record on appeal that would indicate that the trial court or either party noticed the typographical error. Therefore, we do not find that the defendant properly preserved this argument for review. Similarly, the defendant never raised the argument that the modified instruction was flawed in that it was inconsistent in describing the admitted other-crimes evidence, referring to it as both "conduct" and "offense."

¶ 89     Nonetheless, under Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013), "substantial defects [in jury instructions in criminal cases] are not waived by failure to make timely objections thereto if the interests of justice require." Under Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Our supreme court has explained that Rule 451(c) is coextensive with the plain-error clause of Rule 615(a), and the rules are construed identically. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007).

¶ 90     An erroneous instruction constitutes a substantial defect, or plain error, when the instruction created a serious risk that the defendant was incorrectly convicted because the jury did not understand the applicable law, so as to threaten the fundamental fairness of the defendant's

trial. *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 76. In this context, plain error arises in two ways: (1) when the flawed instruction was provided in a case where the evidence was closely balanced, or (2) when the flaw in the instruction is so serious that it denied the defendant a substantial right and undermined the integrity of the judicial process. *Id.*

¶ 91    First, the defendant argues that the use of both "conduct" and "offense" in the jury instruction "may have confused the jury." The defendant does not indicate how the jury may have been confused, and as such, we do not agree with the defendant's argument. We see no possible confusion when interpreting the instruction based on the inclusion of both words.

¶ 92    Next, the written jury instruction included the word "intent" where it is clear that the State and the trial court both intended that the jury instruction should have included the word "propensity." The defendant correctly points out that the committee notes to IPI Criminal No. 3.14 indicate that the issue on which the evidence is the subject of this instruction has been received must be the same issue in both paragraph 2 and paragraph 3. IPI Criminal No. 3.14, Committee Note (approved Oct. 17, 2014). While the committee notes are not the law, the trial court is allowed to deviate from the suggested instructions and format only where necessary to conform to unusual facts or new law. See *People v. Banks*, 287 Ill. App. 3d 273, 280 (1997). While inadvertent, the instruction clearly included an error. The defendant argues that the error resulted in an inaccurate statement of the law and was confusing to the jury because it directed the jurors to consider Shouse's testimony outlining other-crimes evidence for both propensity and intent, where only propensity was proper.

¶ 93    A jury instruction error rises to the level of plain error only when it creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial. *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). An

31

error in a jury instruction is harmless if the result of the trial would not have been different if a proper instruction was given. *People v. Markiewicz*, 246 Ill. App. 3d 31, 44 (1993). Reversal is not warranted if it is unlikely that the error influenced the jury. *People v. Hall*, 194 Ill. 2d 305, 339 (2000).

¶ 94    Here, the defendant argues that the other-crimes evidence, offered for propensity purposes, could not be considered by the jury in determining the defendant's intent. The defendant argues that the purpose of section 115-7.3 of the Code was to create an exception to the common law prohibition on the use of propensity evidence, to allow propensity evidence to be used only in certain types of cases. The defendant argues that the statute was narrowly drawn to carve out only that exception, citing *People v. Childress*, 338 Ill. App. 3d 540 (2003). The defendant then argues, based on the foregoing, that the modified instruction was not an accurate statement of the law. While we agree that the jury instruction was not written as intended and was not in the correct form, we disagree that it was an inaccurate statement of the law or would have caused the jury such confusion that they convicted the defendant because they did not understand the applicable law.

¶ 95    While the trial court stated during the jury instructions conference that the other-crimes evidence went only to propensity, we do not view that statement as an *in limine* ruling, and the defendant does not argue that the consideration of the other-crimes evidence for purposes of intent would have violated such a ruling. While the State did not file a motion *in limine* to obtain a pretrial ruling that the other-crimes evidence could be offered for the common law purpose of intent, a ruling that propensity evidence is admissible under section 115-7.3 does not, in itself, legally foreclose the use of other-crimes evidence for other common law purposes. See 725 ILCS 5/115-7.3(b) (West 2016).

32

¶ 96    Generally, the necessary instructions to ensure a fair trial include the elements of the crime charged, the presumption of innocence, and the question of burden of proof. *People v. Hooker*, 253 Ill. App. 3d 1075, 1085 (1993). Here, the proffered instruction did not concern any of these areas. The error in the jury instruction, the inclusion of the word "intent," could only have caused potential confusion in that the jurors may have believed that they could consider the other-crimes evidence for purposes of determining the defendant's propensity and intent. If the jury is permitted to consider other-crimes evidence in a certain case for non-propensity reasons, it is error but often harmless error, because the other non-propensity purposes are not the overriding concern. *Potts*, 2021 IL App (1st) 161219, ¶ 187. When the trial court admits other-crimes evidence for a non-propensity purpose, it should instruct the jury to consider the evidence *only* for that purpose. *People v. Brown*, 319 Ill. App. 3d 89, 99 (2001). When other-crimes evidence is admitted pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963, however, it "may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3 (West 2016).

¶ 97    In the present case, the other-crimes evidence was admissible to show propensity and was also relevant, and thus admissible, to show the defendant's intent. The pattern instruction defining intent states that: "[a] person acts with intent to accomplish a result or engage in conduct when his conscious objective or purpose is to accomplish that result or engage in that conduct." Illinois Pattern Jury Instructions, Criminal, No. 5.01A (4th ed. 2000); *People v. Boyd*, 366 Ill. App. 3d 84, 91-92 (2006). The defendant argued in his opening statement at trial that he did not have any bad intentions toward C.C. The defendant testified that it was not his intention to bring C.C. into the hotel room. In his motion for a directed verdict, the defendant argued that C.C. misinterpreted the defendant's intentions in going to the liquor store and hotel and argued the same in closing arguments.

33

¶ 98    Despite the fact that the State sought to admit the other-crimes evidence for propensity, where intent was at issue and the other-crimes evidence was relevant to that issue, the jury could properly consider the evidence for the purpose of determining the defendant's intent so long as it bears some threshold similarity to the crime charged. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). Other-crimes evidence admitted for non-propensity purposes is less inherently prejudicial than other-crimes evidence admitted for propensity purposes. *People v. Ward*, 2011 IL 108690, ¶ 29. We therefore fail to see how any additional prejudice would flow from the jury considering the additional issue of intent, especially where the trial court conducted a thorough balancing test finding that the probative value outweighed the prejudicial effect of the other-crimes evidence and that it bore a threshold similarity to the charged crime for the more prejudicial purpose of propensity.

¶ 99    Even if an instruction is given that includes improper issues, it is not necessarily grounds for reversal. We note that the trial court was not required to give any limiting instruction. See *People v. Perez*, 2012 IL App (2d) 100865, ¶ 58 (limiting instructions are not required where the evidence is admissible under section 115-7.3). "When jurors receive a limiting instruction that permits them to consider evidence for a number of reasons, and one of those reasons is determined on appeal to be improper, judgment of conviction must be affirmed despite the overly broad instruction." (Internal quotation marks omitted.) *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 52 (quoting *People v. Jones*, 156 Ill. 2d 225, 240 (1993)). Where the written jury instruction properly instructed the jury that it could consider the other-crimes evidence as to the defendant's propensity and intent, the jury was properly instructed. This is true despite the fact that the word "intent" was included as a typographical error. Were it included deliberately, despite the incorrect format, it was not an incorrect statement of the law, and its inadvertent inclusion does not change

34

its legal relevance. Therefore, there was no plain error and the defendant's argument regarding the jury instruction remains forfeited.

¶ 100                                    C. Rule 431(b)

¶ 101    The defendant next argues that the trial court failed to fully comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The defendant argues that the court erred in failing to ask the venire if they understood and accepted the Rule 431 principles, instead asking if any potential jurors had a "quarrel" with the principles and could follow them if instructed to do so. While the defendant admits that he forfeited this issue as he did not object at trial or file a posttrial motion raising it, he requests this court to review his claim under the plain-error doctrine, arguing that the evidence was closely balanced. We are not persuaded.

¶ 102    Rule 431(b) ensures a defendant's right to a fair and impartial jury is realized. *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 78. The rule requires trial courts to explain and question jurors about their understanding and acceptance of the four basic principles of law known as the *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472 (1984)). Those principles are that (1) the defendant is presumed innocent of the offenses charged, (2) the State is required to prove the defendant guilty beyond a reasonable doubt, (3) the defendant is not required to present any evidence, and (4) the defendant is not required to testify and, if he chooses not to do so, jurors may not draw any negative inferences from this fact. *People v. Thompson*, 238 Ill. 2d 598, 606 (2010) (citing Ill. S. Ct. R. 431(b)); see also *Zehr*, 103 Ill. 2d at 477.

¶ 103    Failure to object to the court's questioning during *voir dire* forfeits appellate review of any claimed *Zehr* error. *People v. Belknap*, 2014 IL 117094, ¶ 47. Because failure to fully comply with Rule 431(b) is not a structural error, it cannot be reviewed under the second prong of the plain-error rule, which allows for review of errors so serious that it denied the defendant a substantial

35

right and undermined the integrity of the judicial process. *People v. Birge*, 2021 IL 125644, ¶ 24. First-prong plain error requires the defendant to prove that the evidence was so closely balanced that the error alone prejudiced him. *People v. Adams*, 2012 IL 111168, ¶ 21. An error will be deemed actually prejudicial if the defendant has shown that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice. *People v. Sebby*, 2017 IL 119445, ¶ 51.

¶ 104 The first step in plain-error analysis under either prong is to determine whether an error occurred at all. *Id*. We review *de novo* whether a trial court has complied with the requirements of Rule 431(b). *People v. Wilmington*, 2013 IL 112938, ¶ 26.

¶ 105 Here, the trial court questioned one panel of 24 potential jurors. The trial court recited the first three principles of Rule 431(b) to the potential jurors and asked if anyone had "a quarrel" with those propositions of the law or "don't believe that you, for whatever reason, you could follow those if the Court instructs you to do so?" The defendant concedes that the record does not indicate that any potential juror raised their hand or said that they could not follow those principles. The court did not ask the jurors about the fourth *Zehr* principle regarding a defendant's failure to testify; however, the defendant concedes that he suffered no prejudice from the trial court's failure to inquire about the fourth principle since he testified on his own behalf.

¶ 106 The trial court is required to give all prospective jurors an opportunity to indicate whether they both understand and accept each of the four *Zehr* principles. *Thompson*, 238 Ill. 2d at 607. While Rule 431(b) does not specify the manner in which jurors must be asked whether they understand and accept the four principles, it is clear that jurors must be asked those two simple questions: "do you understand" and "do you accept." *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 27. The State concedes that the trial court did not properly comply with Rule 431(b) where the

trial court failed to ask potential jurors if they understood the *Zehr* principles. See *Wilmington*, 2013 IL 112938, ¶ 32 (failure to ask potential jurors if they understood the *Zehr* principles was error in and of itself).

¶ 107    In determining whether evidence in a case is closely balanced under first-prong plain error such that "the error alone severely threatened to tip the scales of justice," a reviewing court must "evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶¶ 51, 53. It assesses evidence on the elements of the offense and any evidence regarding a witness's credibility. *Id.* ¶ 53. Evidence may be closely balanced where a case turns on a credibility determination between conflicting testimony. *Id.* ¶¶ 55-63. No credibility contest exists, however, where one party's account is unrefuted, implausible, or corroborated by other evidence. *People v. Scott*, 2020 IL App (1st) 180200, ¶ 51; see also *People v. Olla*, 2018 IL App (2d) 160118, ¶¶ 35-38 (evidence was not closely balanced where, although defendant denied the victim's allegations, there was some corroboration); *People v. Effinger*, 2016 IL App (3d) 140203, ¶¶ 1, 26 (evidence was not closely balanced where, although direct evidence was limited to victim's testimony, circumstantial evidence supported it); *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90 (evidence was not closely balanced where evidence, including the defendant's own testimony, corroborated complaining witness's version of events and defendant's entire version strained credulity); *People v. Anderson*, 407 Ill. App. 3d 662, 671 (2011) (evidence was not closely balanced because the jury was not faced with two equally credible versions of events).

¶ 108    While the defendant argues that the present case turned on a credibility contest between himself and C.C., there was significant corroboration for C.C.'s version of events. There were also several inconsistencies between the defendant's testimony at trial and his interview with Deputy

37

Murray, which damaged the defendant's credibility. The defendant denied being at the Relax Inn during his interview and only admitted to being at the Relax Inn when confronted with the video and documentary evidence. The defendant further stated in his interview that he had purchased the Jack Daniel's lemonade for his sister but at trial testified that he had purchased the alcohol for Flood. Also, during his interview, the defendant stated that he was not aware of accusations against him, but later acknowledged that he was aware of the form of touching that he was accused of committing. The defendant also denied at trial that it was his intent to bring C.C. into the hotel room; however, he qualified his answer with, "Well, she would have been with me until her mom got there." As such, there was sufficient evidence at trial to allow the jury to doubt the credibility of the defendant.

¶ 109   There was also evidence at trial to support C.C.'s version of events. Telephone records indicated that the calls C.C. made in her efforts to get away from the defendant were actually made at the time C.C. had testified to making them. C.C.'s boyfriend also testified that C.C. was scared, panicked, and crying when he finally located her at the Relax Inn. Further, the defendant's actions after C.C. left the hotel contradict the defendant's testimony that he obtained the hotel room for a liaison with Flood because, upon finding that C.C. was gone, he did not contact Flood or law enforcement, but returned home where the police eventually found him.

¶ 110   Finally, contrary to the defendant's assertions, this was not a case with only the competing versions of events that occurred between C.C. and the defendant. Shouse testified that he had witnessed the defendant attacking his 12-year-old sister after providing Shouse and his sister with alcohol. Such evidence went to the defendant's propensity to commit the offenses for which he was charged.

¶ 111 Our supreme court has found that evidence is closely balanced where the outcome of the trial depended on a credibility contest between each side's witnesses, both sides' versions of events were credible and not implausible, and neither side's versions of events were supported by extrinsic, corroborating evidence. *Sebby*, 2017 IL 119445, ¶¶ 61-63. For the reasons outlined above, we find that the defendant's version of events was not credible, and portions were implausible, while C.C.'s version of events was corroborated by extrinsic evidence and other witnesses, and thus, more credible.

¶ 112 Because we do not find the evidence to be so closely balanced that the Rule 431(b) error severely threatened to tip the scales of justice against the defendant, we decline to consider the defendant's claim under the plain-error doctrine. Finally, although we have not found plain error in this matter, we again encourage the trial courts to use the express terms enumerated in Rule 431(b) and remind the trial courts to question potential jurors whether they "understand" and "accept" the four principles of Rule 431(b).

¶ 113                               D. Sentencing

¶ 114 The defendant next argues that the trial court erred in sentencing the defendant for the offense of aggravated criminal sexual abuse by considering, in aggravation, that the defendant's actions caused or threatened serious psychological harm. The defendant argues that nothing in the record indicates that the defendant's conduct caused or threatened serious psychological harm, as the record shows neither evidence of actual harm caused nor circumstances that would be expected to cause harm beyond that inherent in the charge of aggravated criminal sexual abuse.

¶ 115 The State argues that the defendant forfeited this issue as the defendant failed to object to the trial court's consideration of the aggravating factor and did not effectively raise the issue in his posttrial motion. The State argues that, while the defendant's posttrial motion includes the sentence

"[t]he Defendant's sentence was excessive in light of the following: A. The State's evidence in aggravation," the defendant did not specifically raise the issue of the trial court's consideration of a factor in aggravation that was inherent in the offense. As the defendant stood on his written motion without presenting any argument at the motion hearing, the trial court would not have had any opportunity to review the issue of its consideration of psychological harm. We agree with the State that the issue was not properly preserved.

¶ 116   To preserve a sentencing issue for appeal, a defendant must both object at the sentencing hearing and raise the issue in a motion to reduce the sentence. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010); see also 730 ILCS 5/5-4.5-50(d) (West 2018). Our supreme court, however, has held that counsel is not required to interrupt the trial court as it discusses factors in aggravation in order to preserve a claim of error regarding the trial court's remarks. *People v. Saldivar*, 113 Ill. 2d 256, 266 (1986). While a failure to object to the trial court's commentary when pronouncing the defendant's sentence has been excused, the defendant here also failed to effectively raise his claim in a postsentencing motion. Although the defendant raised the issue that the trial court improperly considered certain evidence in aggravation, defense counsel failed to illuminate in any way what evidence may have been improperly considered. In the defendant's opening brief to this court, he initially argues that the error was preserved, but in his reply brief, he concedes that this issue was forfeited.

¶ 117   The defendant's reply brief goes on to request this court to review this issue under the plain-error doctrine of Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), which permits this court to address a forfeited issue if the evidence is closely balanced or the error affects substantial rights. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). The State argues that plain-error review was also forfeited as it was not argued in the defendant's initial brief. Our supreme court has recognized

that one purpose of the plain-error rule is to preserve the integrity and the reputation of the judicial process. *People v. Gard*, 158 Ill. 2d 191, 205 (1994). As such, the supreme court has considered a defendant's plain-error argument raised for the first time in a reply brief. See *People v. Thomas*, 178 Ill. 2d 215, 235 (1997). We will do so here.

¶ 118　The doctrine of plain error may be applied to remedy errors so plain and prejudicial that failure to object to them is not a waiver for purposes of appeal. *People v. Davis*, 145 Ill. 2d 240, 251 (1991). In the sentencing context, a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Id.* The burden of proof rests with the defendant to establish either prong of the plain-error doctrine. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008).

¶ 119　The defendant argues that second-prong plain error applies to this issue because the trial court's consideration of a factor inherent in the offense affects the defendant's fundamental right to liberty. See *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 17 (holding that the trial court's consideration of a factor inherent in the offense impinged on the defendant's right not to be sentenced on an improper factor and thus affected his fundamental right to liberty). For plain error to exist, however, we must first decide that an error actually occurred. *Naylor*, 229 Ill. 2d at 593.

¶ 120　Imposition of a sentence is normally within a trial court's discretion, and there is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, such that the trial court's sentencing decision is reviewed with great deference. *People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008). Nevertheless, whether the trial court improperly considered a factor implicit in the offense is reviewed *de novo*. *People v. Phelps*, 211 Ill. 2d 1, 12 (2004). The burden is on the defendant to affirmatively establish that the sentence was based on improper considerations. *People v. Dowding*, 388 Ill. App. 3d 936, 942-43 (2009).

¶ 121  Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense, absent a clear legislative intent to accomplish that result. *People v. Ferguson*, 132 Ill. 2d 86, 97 (1989). Such dual use of a single factor is often referred to as a "double enhancement." *People v. Gonzalez*, 151 Ill. 2d 79, 85 (1992). The prohibition against double enhancements assumes that, in designating the appropriate range of punishment for a criminal offense, the legislature considered the factors inherent in the offense. *People v. Rissley*, 165 Ill. 2d 364, 390 (1995). However, the rule should not be applied rigidly, because public policy requires that a sentence be varied according to the circumstances of the offense. *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 15.

¶ 122  In the present case, the defendant argues that the trial court erred in considering psychological harm as an aggravating factor at sentencing regarding the charge of aggravated criminal sexual abuse. The defendant was convicted of this charge, a Class 2 felony, and sentenced to seven years' incarceration, which was the maximum sentence within the sentencing range. 720 ILCS 5/11-1.60(d) (West 2016); 730 ILCS 5/5-4.5-35(a) (West 2016). Section 5-5-3.2 of the Unified Code of Corrections provides that a sentencing court may consider certain factors as reasons to impose a more severe sentence, including whether "the defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2016).

¶ 123  In the present case, the circuit court pronounced at sentencing, as follows:

> "[T]here's a distinction between harm or threatened harm in the factors in mitigation and aggravation. In aggravation it does not use the word physical. Says the defendant's conduct caused or threatened serious harm.
>
> [The State] did argue that based upon the victim impact statement that harm, serious emotional harm has been caused. With respect to threatened harm, probably the most

poignant part of the trial evidence that this Court considered was the evidence towards the end of the incident where both the Defendant and [C.C.] were at the hotel.

[C.C.] was there obviously scared as she contacted her boyfriend, I believe, and is seen on the video fleeing from the Defendant's truck into the waiting car of her boyfriend and I believe mother, other relative. The Court gives pause to think about what could have happened had that not taken place.

The Court does find factor number one as a factor in aggravation."

It is clear that the trial court considered, in determining the appropriate sentence, that the defendant's criminal conduct either caused or threatened to cause serious psychological harm to C.C.

¶ 124　The defendant argues that there was no basis for such a finding. Relying on *People v. Calva*, 256 Ill. App. 3d 865, 875 (1993), the defendant argues that a sentencing court's consideration of serious psychological harm to children due to sexual abuse is improper when no evidence of a greater degree of psychological harm than is inherent to sexual abuse cases was presented. In *Bunning*, 2018 IL App (5th) 150114, ¶¶ 20-21, this court held that the trial court's consideration of psychological harm to a child victim of sexual abuse was appropriate where: (1) the victim testified regarding the instances of abuse, (2) the trial court noted evidence that the child sought psychological treatment, and (3) the mother of the victim submitted an impact statement which "outlined the upheaval caused by defendant's abuse" and "referred to 'counseling appointments.' "

¶ 125　While the defendant correctly recites the holding in *Calva*, we find this case is distinguishable and more closely resembles *Bunning*. We first note that *Calva* has been recognized as an outlier. In *People v. Muraida*, 2021 IL App (4th) 180650-U, the court stated:

"*Calva* is an outlier, and of the 27 times it has been cited by Illinois courts as of this writing, none have been in actual support of defendant's proposition [that psychological harm caused by a sex crime on a child is not a proper factor to be considered in aggravation of sentence for that crime]." *Id.* ¶ 59.

¶ 126 The trial court also considered the evidence at trial, including the video of C.C. fleeing the defendant's truck, commenting that it believed that C.C. was obviously scared. Additionally, in the present case, C.C. testified during the trial, giving the trial court an opportunity to observe her demeanor, and provided a victim impact statement at the defendant's sentencing. In the victim impact statement, C.C. detailed that since the incident, she had nightmares about what had happened, she hates being hugged, tapped, or patted on the shoulder, and she is paranoid someone is watching or following her if she goes to a store alone. C.C. intimated that she has weird, uncomfortable, and uneasy feelings when she is around older men. Further, she has trust issues and feels anxious and nervous around people who drink alcoholic beverages or are intoxicated, believing they may lose control and become sexually inappropriate. C.C. indicated that she was scared of the defendant.

¶ 127 The defendant's argument that psychological harm was an improper sentencing factor rests largely on the fact that the State presented no evidence that C.C. received any medical treatment or counseling. To clarify, we do not believe that the admissibility of psychological harm necessarily requires the three-element analysis found in *Bunning*. See *People v. Sutton*, 2022 IL App (5th) 190160-U, ¶ 42 (list of evidence the sentencing court could have relied upon in determining a minor victim suffered psychological harm was not intended to be indicative of a rule that such specific elements were necessary in a court's consideration in sentencing that defendant's conduct caused or threatened serious psychological harm). Psychological harm to a victim can be

44

considered as an aggravating factor without direct evidence of harm. See *People v. Reber*, 2019 IL App (5th) 150439, ¶ 94. Accordingly, as in *Bunning*, we conclude that the record supports a finding of psychological harm, or threatened harm to C.C., and the court did not err in considering this factor in aggravation at sentencing.

¶ 128                           E. Ineffective Assistance of Counsel

¶ 129   Finally, the defendant argues that defense counsel provided ineffective assistance of counsel in failing to seek several redactions of his audio recorded interrogation (interrogation) with law enforcement. The defendant argues that he suffered prejudice when his interrogation was played for the jury and they were allowed to hear that the defendant was accused of sexual assault but pleaded guilty to possession of child pornography, and that he was required to register as a sex offender. The defendant argues that the evidence would have impermissibly negatively affected the jury's credibility assessment and opinion of the defendant and violated an *in limine* order from the trial court finding that the prior child pornography conviction was inadmissible. Further, the defendant argues that defense counsel's failure to request a redaction or object to the interrogation's inclusion of the defendant invoking his right to counsel was an error that resulted in an unfair trial. Finally, the defendant argues that defense counsel was ineffective in failing to object to the State's questions in cross-examination of the defendant and in closing argument, where the State argued that the defendant was incredible where he failed to disclose his affair with Flood during his police interrogation, likening the State's questioning and closing arguments to commentary on the defendant's postarrest silence.

¶ 130   "To demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance,

there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Further, in *People v. Veach*, 2017 IL 120649, the supreme court explained that a defendant arguing that he received ineffective assistance of counsel must show that counsel's performance was objectively unreasonable under prevailing professional norms. *Id.* ¶ 30. The *Veach* court also added that a reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Id.* "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 697). As a result, where it is easier to dispose of a claim of ineffective assistance of counsel on the ground that it lacks a sufficient showing of prejudice, a reviewing court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient. *People v. Johnson*, 2021 IL 126291, ¶ 53 (citing *People v. Givens*, 237 Ill. 2d 311, 331 (2010). When a claim of ineffective assistance of counsel was not raised before the trial court, the appellate court's review is *de novo*. *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 85.

¶ 131   Here, the defendant argues that the defendant was prejudiced by the cumulative effect of his attorney's failings, pointing out that the combination of errors resulted in a jury trial that was fundamentally unfair. In weighing the impact of trial counsel's errors, we consider the totality of the evidence before the finder of fact. *Strickland*, 466 U.S. at 695. The reviewing court must look to the ramifications the improper evidence might have had on the factfinder's overall picture of events. *Id*. at 695-96.

¶ 132   As shall be explained below, we find that the defendant has not adequately demonstrated that he was prejudiced by trial counsel's failures when taking into account all of the properly admitted evidence. Therefore, defendant's ineffective assistance of counsel claim fails.

¶ 133                              1. Other-Crimes Evidence

¶ 134   First, we will address trial counsel's failure to file a motion to redact other-crimes evidence from the interrogation and failure to object to the same when the State published the audio recording to the jury. The State's use of the unredacted interrogation violated the trial court's order *in limine* excluding the defendant's prior conviction for possession of child pornography. The interrogation allowed the jury to hear that the defendant had a prior child pornography conviction and was required to register as a sex offender.

¶ 135   We acknowledge that the trial court entered an order *in limine* that prohibited the introduction of the defendant's conviction for child pornography, finding that the probative value of the other-crimes evidence was outweighed by the prejudicial effect. While we are not asked to review that ruling, in the context of ineffective assistance of counsel, we do not find that the introduction of the other-crimes evidence in the interrogation was overly prejudicial or damaging to the defendant's credibility. In fact, the potential prejudice from the mention of the prior conviction in the interrogation, if any, was minimal.

¶ 136   In so finding, we note that among other evidence affecting the defendant's credibility, an incident of predatory criminal sexual assault was properly admitted for purposes of determining the defendant's propensity to commit the charged offense. The danger of unfair prejudice in the context of a section 115-7.3 case, as opposed to a common-law other-crimes case, is greatly diminished by the fact that other-crimes evidence to establish propensity is *per se* prejudicial. See *People v. Perez*, 2012 IL App (2d) 100865, ¶ 49. Here, the interrogation included a comment that the defendant was convicted of possession of child pornography. During the interrogation, the defendant explained that he was originally charged with sexually molesting a 12-year-old girl, but that the charges were dropped when no DNA evidence was found. The defendant also claimed that

the child pornography was on his computer because the 12-year-old girl placed it there while she was sexting. These charges were not mentioned again outside of the recorded interrogation.

¶ 137   The defendant was charged in the present case with three offenses of a sexual nature allegedly committed against a 14-year-old girl. The jury heard properly admitted evidence from Shouse, who described seeing the defendant committing a sexual assault against his young sister and his own fight to stop the assault. We do not see that the inclusion, in error, of a brief reference to an instance of possession of child pornography, inclusive of the defendant's minimization of the same, would be particularly more heinous than the charged conduct and properly admitted propensity evidence, such that it might be unduly prejudicial. The same can be said of the defendant's requirement to register as a sex offender.

¶ 138   Further, the jury could have inferred that the conviction discussed in the recorded interview was one that resulted from the sexual assault that Shouse testified about, since the defendant stated that the girl from the child pornography conviction was 12 years old. This would have been a reasonable inference based on Shouse's testimony about his sister, also a 12-year-old girl. The jury could have also reasonably inferred that the defendant's status as someone required to register as a sex offender was based on the sexual assault committed against Shouse's sister. It would be highly unlikely, then, that the jury would have been additionally prejudiced against the defendant based on the failure to redact the recorded interview.

¶ 139   Even if the jury considered the evidence to be committed against an additional victim, considering the other evidence that was relevant to the defendant's credibility, we do not find that the additional other-crimes evidence would have served to unduly prejudice the defendant. The defendant damaged his own credibility when he lied to Deputy Murray about going to the Relax Inn, told the police the Jack Daniel's lemonade was for his sister, but then testified that it was

48

purchased for Flood or whomever wanted it, and by testifying that he was not aware of the gravity of the accusations but admitting on cross-examination that he was aware of the nature of charge.

¶ 140    Given the underlying charges and the properly admitted propensity evidence, there was minimal likelihood that the defendant was any more prejudiced by the inclusion of the additional other-crimes evidence contained in the interrogation. Additionally, given the other evidence admitted at trial as a whole, the jury could reasonably have decided that the defendant was incredible without considering his child pornography conviction and registration status. While we agree that trial counsel should have moved to redact the interrogation to preclude any mention of the defendant's requirement to register as a sex offender and his conviction for child pornography, and should have objected to the same, we do not find that there is a reasonable probability that the result of the proceeding would have been different had counsel done so. Thus, the defendant has failed to meet the second prong of *Strickland* regarding other-crimes evidence.

¶ 141                                        2. Request for a Lawyer

¶ 142    The defendant next argues that counsel provided ineffective assistance in failing to redact or object to the interrogation where the defendant could be heard invoking his right to counsel. The jury heard the defendant state: "I'll take a lawyer," at the end of his interrogation.

¶ 143    In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the United States Supreme Court held that the prosecution generally cannot ask questions or remark on a defendant's postarrest silence. Our supreme court has recognized that the *Doyle* rule prohibiting the use of a defendant's silence against him also applies to his post-*Miranda*-warning request for an attorney. *People v. Dameron*, 196 Ill. 2d 156, 163-64 (2001).

¶ 144    In *Dameron*, an officer testified on direct examination that the defendant had asked to speak with an attorney. *Id*. at 163. Defense counsel objected to that testimony and moved for a mistrial,

49

which was denied. *Id.* In determining whether the *Doyle* violation was harmless error, the court considered the following factors: (1) the party who elicited the testimony about the defendant's silence, (2) the intensity and frequency of the references to the defendant's silence, (3) the use that the prosecution made of the defendant's silence, (4) the trial court's opportunity to grant a mistrial motion or to give a curative jury instruction, and (5) the quantum of other evidence proving the defendant's guilt. *Id.* at 164.

¶ 145   In *People v. Beaty*, 377 Ill. App. 3d 861 (2007), this court examined the State's reference to a defendant's postarrest silence and request for an attorney under the framework of ineffective assistance of counsel. *Id.* at 888. We reasoned that the investigator's testimony that the defendant said " 'he better wait for an attorney' " before talking was a minor part of the investigator's testimony. *Id.* at 888-89. The prosecutor did not comment on that portion of the investigator's testimony, and the evidence was not closely balanced. *Id.* This court concluded that the defendant did not demonstrate that a reasonable probability existed that his trial result would have been different if his attorney had objected to the investigator's testimony about the defendant's request for an attorney. *Id.* at 889.

¶ 146   In the present case, as we have already discussed, the evidence was not closely balanced. The primary facts in dispute were whether the defendant touched C.C.'s breast and the defendant's intent toward C.C. on the night in question. C.C. testified that the defendant touched her breast, while the defendant denied the same. The jury had the ability to observe C.C. and the defendant testify. Further, the jurors heard the defendant's interrogation interview and had an opportunity to hear all of the evidence and weigh the witnesses' credibility, any inconsistencies in their testimony, and any corroboration of their testimony.

50

¶ 147   While we agree with the defendant that the ultimate issue was one of credibility, we do not find that the brief portion of the interrogation where the defendant requested an attorney would have so influenced the jury that the defendant did not receive a fair trial. The State introduced the interrogation which included the defendant's request for an attorney. The defendant's comment was brief and isolated, and there was no further discussion of the defendant invoking his right to counsel during the trial by any party. While we again agree with the defendant that defense counsel should have both moved to redact the video and objected to the inclusion of the defendant's assertion of his right to counsel, the defendant has failed to demonstrate that there is a reasonable probability that the result of the trial would have been different if defense counsel had objected to the portion of the video where the defendant requested an attorney. Thus, the defendant has failed to meet the second prong of *Strickland* regarding his request for a lawyer during his interview and his ineffective assistance claim fails on this issue. See *People v. Graham*, 206 Ill. 2d 465, 476 (2003) ("a comment upon a defendant's post-arrest silence, while improper, is not an error of such magnitude as to clearly deprive the defendant of a fair trial" (internal quotation marks omitted)); and *Beaty*, 377 Ill. App. 3d at 861 (where the defendant failed to demonstrate a reasonable probability that the result of his trial would have been different had counsel objected to testimony about his postarrest silence and request for counsel, his ineffective assistance claim fails).

¶ 148                                      3. Postarrest Silence

¶ 149   Lastly, the defendant argues that he was denied the effective assistance of counsel based on defense counsel's failure to object to portions of the State's cross-examination of the defendant and remarks made by the State in closing argument and in rebuttal. Specifically, the defendant maintains that defense counsel should have objected to the State's questions and arguments regarding the defendant's failure to disclose, during his police interrogation, his affair with Flood.

51

The defendant contends that defense counsel was ineffective for failing to object to these arguments because he had a constitutional right not to disclose the affair to Deputy Murray.

¶ 150   A defendant's postarrest silence after being Mirandized may not be used to impeach his trial testimony. *Doyle*, 426 U.S. at 619. To impeach a defendant with his silence after warning him that he had a right to remain so, implying that it would not be held against him, would be fundamentally unfair and violate due process. *Id*. at 618-19. The prohibition does not apply when a defendant makes a voluntary statement to the police and relates a version that is inconsistent with his trial testimony. *Anderson v. Charles*, 447 U.S. 404, 408 (1980). The State may, in such a case, remark on a defendant's postarrest silence when his in-court testimony is inconsistent with the statement previously given to the police. *People v. Frieberg*, 147 Ill. 2d 326, 356 (1992). Where a defendant has not remained silent, at least as to the subject matter of his statements, such questioning does not unfairly use his postarrest silence against him. *People v. Bailey*, 2020 IL App (5th) 160458, ¶ 91 (citing *Charles*, 447 U.S. at 408).

¶ 151   Considering the first prong of *Strickland*, we must determine whether the State's question during cross-examination was improper such that defense counsel's performance fell below an objective standard of reasonableness in failing to object. The question before us, then, is whether this case is controlled by *Doyle* or *Anderson*. In making this determination, the court considers whether the defendant's postarrest statements go beyond mere denial of knowledge and are manifestly inconsistent with exculpatory trial testimony. *Frieberg*, 147 Ill. 2d at 356. Where the defendant omits significant details in his initial version of events that are inconsistent with his trial testimony, the State may use the inconsistency to test the defendant's defense theory. *People v. Maggio*, 2017 IL App (4th) 150287, ¶ 24.

¶ 152 The defendant argues that his statements to Deputy Murray and his testimony at trial were not directly inconsistent, and their use was thus improper for purposes of impeachment. The defendant maintains that, while he did not remain silent and offered a substantive version of events to Deputy Murray, he remained silent regarding his affair with Flood. Thus, the defendant argues, it was improper for the State to comment on the defendant's failure to mention the affair. We disagree.

¶ 153 The defendant's statement that the hotel room was for himself, to sleep in more comfortably, was inconsistent with the defendant's testimony that the room was actually for him and Flood to spend time together. Similarly, the defendant did not remain silent regarding his relationship with Flood. Rather, the defendant affirmatively described his relationship with Flood as close friends during his interview, but at trial he described their relationship as a sexual and romantic affair that had been going on for almost a year. Further, the defendant told Deputy Murray that he purchased the Jack Daniel's lemonade for his sister, which was directly inconsistent with his trial testimony that it was for Flood or whoever wanted it.

¶ 154 The defendant relayed his version of events on the night in question to Deputy Murray. Only at trial did the defendant indicate that the motivations he described to Deputy Murray were not true, but that his actions on the night in question were actually influenced by his affair with Flood. Thus, his initial version of events given during his interrogation was inconsistent with his subsequent trial testimony and his theory of defense. The State could properly cross-examine the defendant regarding his prior inconsistent statements made following his arrest. See *Frieberg*, 147 Ill. 2d at 356. We find that there was no *Doyle* violation and, thus, the State's questions during cross-examination of the defendant were proper. As a prosecutor can make arguments on the facts in evidence and legitimate inferences to be drawn from that evidence (*People v. Angelly*, 167 Ill.

App. 3d 477, 484 (1988)), the State was permitted to comment in closing arguments that the defendant never told the police about his alleged affair with Flood, and that it, therefore, must be a recent fabrication.

¶ 155 Counsel is not required to make losing objections in order to provide effective representation. *People v. Lewis*, 88 Ill. 2d 129, 156 (1981). Thus, we find that the defendant's claim of ineffective assistance of counsel for defense counsel's failure to object to the State's questions and arguments regarding the defendant's failure to disclose his affair with Flood during the interrogation also fails.

¶ 156                                    4. Cumulative Errors

¶ 157   The defendant briefly alludes to *People v. Vera*, 277 Ill. App. 3d 130, 141 (1995), for the proposition that the errors made by defense counsel should be viewed cumulatively to determine whether the defendant is entitled to a new trial as a result. We have rejected the defendant's claims of ineffective assistance of counsel, concluding that counsel's performance was not deficient or, even if deficient, did not result in prejudice under *Strickland*. Because we have rejected every claim of error, cumulative-error analysis is not necessary.

¶ 158                                    III. CONCLUSION

¶ 159   We find that the defendant was not denied a fair trial where the trial court's discovery sanction was not an abuse of discretion and resulted in no prejudice to the defendant. We also find that the defendant's argument regarding jury instructions was forfeited, and that the trial court's error in questioning the jury pursuant to Illinois Supreme Court Rule 431(b) did not result in prejudice where the evidence was not closely balanced. Finally, we find that the trial court properly considered that the defendant's actions caused or threatened serious psychological harm, and that

54

the defendant was not denied the effective assistance of counsel. Therefore, we affirm the judgment and sentence of the circuit court of Effingham County.

¶ 160   Affirmed.